Roy LYMAN, Petitioner,

v.

Frank X. HOPKINS, Respondent.

No. 4:CV93–3060.

United States District Court,
D. Nebraska.

Jan. 30, 1995.

Ross A. Stoffer, Mueting & Stoffer, Norfolk, NE, for petitioner Lyman.

Mark D. Starr, Asst. Atty. Gen., Lincoln, NE, for respondent Hopkins.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This is a habeas corpus case brought by petitioner Roy Lyman (Lyman), pursuant to 28 U.S.C. § 2254, challenging his guilty pleas and resulting sentences regarding two counts of first-degree assault and one count of using a knife in the commission of a felony. These charges were much reduced. Lyman was originally charged with trying to murder two children by slashing their throats as they slept, while assaulting two adults with a knife in the process.

United States Magistrate Judge David L. Piester has recommended that Lyman's petition be granted in part and denied in part. (Filing 67.) Specifically, Judge Piester recommended that the writ be granted as to claims 3(d), 3(f), 3(g) and 3(h) and that the petition be denied on the merits as to claims 2(b), 3(a), 3(j) and 3(k).[1] Petitioner has not objected to Judge Piester's report and recommendation.

Respondent has objected to that portion of the report and recommendation regarding the granting of relief to Petitioner, contending that Judge Piester was wrong both on the merits and procedurally.[2] (Filing 69).

Judge Piester believed the granting of the writ was justified for two reasons, both of them involving ineffective assistance of counsel. Both findings of ineffective assistance of counsel were in turn predicated upon two separate but related acts or omissions of counsel. Essentially, Judge Piester found and concluded that:

(1) Trial counsel was ineffective because: (a) counsel did not (i) advise Lyman of the mandatory consecutive nature of the possible sentences (claim 3(g)) nor (ii) advise Lyman

---

1. I previously adopted in part and rejected in part, (Filing 49), a report and recommendation, (Filing 41), regarding procedural defaults of various claims. I adopted Judge Piester's recommendation that claims 1(a), 1(b), 1(c), 2(c), 2(d), 2(f), 3(b), 3(c), 3(e), 3(i), 3(l), 3(m), 4(a), 4(b), 5, 6(a) and 6(b) be dismissed for procedural default. (Filing 49, ¶¶ 1–2.) I rejected Judge Piester's recommendation regarding claim 2(a), and I determined that claim 2(a) had been procedurally defaulted because it was not presented on direct appeal, as required by Nebraska law. (*Id.*, ¶¶ 1–3.)

2. Respondent makes the following specific objections to Judge Piester's report and recommendation:

   (1) Judge Piester erred when he concluded that October 17, 1987, was the deadline for filing a notice of intent to pursue the insanity defense;

   (2) Judge Piester erred when he omitted a first-degree assault charge from the counts originally facing Petitioner;

   (3) Judge Piester erred by not applying the "presumption of correctness" found in 28 U.S.C. § 2254(d);

   (4) Judge Piester erred by not discussing the fact that Petitioner was originally charged with four counts of use of a weapon;

   (5) Judge Piester erred when he recommended that relief be granted as to claim 3(g) because: (a) it was not established that Petitioner was improperly advised; (b) Judge Piester's report

and recommendation is at odds with other findings; (c) Judge Piester's report focused on the "maximum minimum," not the mandatory consecutive nature of the weapons charge; and (d) awareness of the mandatory consecutive nature of the weapons-charge sentence would have increased the likelihood of a plea since the plea reduced the weapons charges from four to one;

   (6) Judge Piester erred when he recommended that relief be granted as to claim 3(h) because: (a) the manner in which Judge Piester construed the claim was different from the claim made in the petition; (b) the claim on which Judge Piester granted relief was procedurally barred; (c) if the new claim is to be considered, Respondent should be given an opportunity to present additional evidence; and (d) Judge Piester failed to consider evidence bearing on the credibility of Petitioner's claim;

   (7) Judge Piester erred in construing Petitioner's testimony about not pleading guilty had he been correctly advised regarding the "maximum minimum";

   (8) Judge Piester erred by not concluding that the "factual basis" for the ineffective-assistance-of-counsel claim regarding the insanity defense was procedurally defaulted;

   (9) Judge Piester erred in recommending that relief be granted as to claim 3(d) because the facts show that counsel properly investigated the insanity defense.

of the minimum time he would be imprisoned (claim 3(h)); and (b) but for these errors, there was a reasonable probability that Lyman might not have pleaded guilty and instead insisted on a trial. (Filing 67, slip. op. at 12–16.)

(2) Trial counsel was ineffective because: (a) counsel did not (i) investigate (claim 3(d)) and (ii) pursue (claim 3(f)) the insanity defense; and (b) but for these errors, there was a reasonable probability that Lyman might not have pleaded guilty and instead insisted on a trial. (*Id.* at 18–25.)

After de novo review of Judge Piester's report and recommendation and Respondent's objections, I reject the report and recommendation on the merits insofar as it recommends that the writ be granted. After de novo review, I also adopt Judge Piester's report and recommendation insofar as it recommends that the petition be denied. Accordingly, I shall deny the petition.

My reasons for rejecting that portion of Judge Piester's thoughtful report and recommendation suggesting that the petition be granted are set forth in the following opinion.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Lyman was originally charged with two counts of attempted first-degree murder, first-degree assault, second-degree assault, and four counts of use of a knife in the commission of a felony. Pursuant to a plea bargain, Lyman pleaded guilty to an amended charge of two counts of first-degree assault and one count of use of a knife in the commission of a felony. He was sentenced to prison for 5 to 10 years on each count, the sentences to run consecutively.

## A. WHAT THE STATE SUPREME COURT FOUND

The history of this case in the state appellate courts is set out in two published opinions of the Nebraska Supreme Court. In the first case, Lyman's direct appeal was denied, and his conviction and sentences were affirmed in *State v. Lyman*, 230 Neb. 457, 432 N.W.2d 43 (1988) [hereinafter *Lyman I* ]. In

that case, over two dissents, the Nebraska Supreme Court held that:

(1) It was error for the sentencing judge to fail to tell Lyman that his sentence on the charge of using a knife in the commission of a felony was statutorily required to be a consecutive sentence;

(2) Lyman pleaded guilty after being erroneously informed by the sentencing judge that his statutory minimum sentence would be at least 3 years, whereas the statutory minimum sentence was in fact 2 years even given the consecutive nature of the knife charge; and

(3) Since Lyman pleaded guilty believing that his lowest statutory minimum sentence was *greater* than the actual statutorily required minimum, the sentencing judge's failure to advise Lyman regarding the consecutive nature of the sentence on the knife count did not prejudice him.

Lyman subsequently sought postconviction relief in state court. *State v. Lyman*, 241 Neb. 911, 492 N.W.2d 16 (1992) [hereinafter *Lyman II* ]. In a unanimous opinion, the Nebraska Supreme Court rejected Lyman's postconviction attack, finding, among other things, that:

(1) Lyman's counsel was not ineffective for failing to challenge his confession, and even if counsel was ineffective, Lyman was not prejudiced because there were two eye witnesses and Lyman made a spontaneous admission to a police officer;

(2) Lyman's counsel was not ineffective for not seeking a competency hearing given the fact that two defense-retained psychiatrists believed Lyman was competent;

(3) Lyman's counsel was not ineffective for not discussing a possible insanity plea with Lyman because the record reflected such a discussion;

(4) Lyman's counsel was not ineffective for not discussing with Lyman the consecutive nature of the sentence on the knife charge because even if Lyman's counsel failed to discuss this point with Lyman, such omission was not prejudicial for the same reasons articulated in *Lyman I*.

## B. WHAT LYMAN FACED BEFORE THE PLEA

Before Lyman's plea of guilty to the reduced charges, this is what confronted the defense:

1. Following administration of the *Miranda* warnings and waiver of his *Miranda* rights, Lyman admitted attempting to kill two of his daughters (one of the girls was Lyman's natural child and the other was regarded by Lyman as his child even though she had been fathered by another man) by slashing their throats with a knife as they slept and, in the course of these attempted murders, stabbing his ex-wife and her male friend when they walked in on him while he was attempting to kill the girls. (Pet'r's Ex. 1, attached Ex. 205H.)

2. Lyman admitted the attempted killings of his daughters were the product of a conscious mind: "He went on to state that [the attempted murders were] not something that he had not given a great deal of thought to, that he'd been thinking about it for some time and it wasn't just a spur of the moment thing." (*Id.*, Ex. 205H, at 8.)

3. Lyman admitted attempting to kill his two daughters because he thought they were being raised by his ex-wife in a sinful environment; he wanted to kill the children while they were asleep, in a "painless and quick fashion," in order "to send them to Heaven where they would be better off," (*id.*, Ex. 205H, at 6); and the only remorse he felt (at the time of the confession) was that he had not been successful in killing the children. (*Id.* at 7.)

4. Defense counsel retained two psychiatrists, both of whom agreed that while Lyman was quite mentally disturbed at the time the crimes where committed, he nevertheless "did know the nature and consequences of his acts. He also knew at the time of the crime that he deserved punishment for his crime", (Pet'r's Ex. 1, attached Ex. 209, at 8 (Dr. Kentsmith, 8/31/87)), and "[h]e planned it, concealed himself in the house with a weapon, and committed the assaults with full awareness that they were illegal acts." (*Id.*, attached Ex. 215, at 2 (Dr. Mead, 10/29/87).)

5. Both psychiatrists believed Lyman was competent to stand trial. (*Id.*, Ex. 206, at 4; Ex. 207; Ex. 209, at 7; Ex. 215, at 2.)

6. Lyman's confession was well corroborated: for example, Lyman's ex-wife and her friend, both of whom struggled with Lyman and were stabbed by him, identified Lyman as the children's assailant, (*id.*, Exs. 205A & 205B); and shortly after the attacks, Lyman, covered in blood but not yet in custody, walked up to a police officer near the scene of the crime and volunteered, "I'm the one your [*sic*] looking for. I'm the one responsible for what happened down the street, just please take me to jail." (*Id.*, Ex. 205–D2.)

7. Lyman was charged with eight crimes carrying total possible maximum prison sentences of 205 years: [3]

(a) Regarding the children, Lyman was charged with two counts of attempted murder, (Filing 14, Counts III, V), in violation of Neb.Rev.Stat. §§ 28–303(1) & 28–201(4)(a) (Reissue 1989).[4]

(b) Regarding the adults, Lyman was charged with one count of first-degree assault and one count of second-degree assault, (*id.*, Counts I, VII), in violation of Neb.Rev. Stat. §§ 28–308 & 28–309(1)(a) (Reissue 1989).[5]

(c) Regarding the children and the adults, Lyman was charged with four counts of using a knife in the commission of a felony, (*id.*, Counts II, IV, VI, VIII), in violation of Neb.

---

3. *Lyman II*, 241 Neb. at 917, 492 N.W.2d at 21 (so finding in this case and applying Neb.Rev. Stat. § 28–105 (Reissue 1985)).

4. These charges were Class II felonies. Accordingly, the statutory maximum prison sentence for each count was 50 years, and the statutory minimum was 1 year. Neb.Rev.Stat. § 28–105(1) (Reissue 1985).

5. These charges were, respectively, Class III and Class IV felonies. The statutory maximum prison sentence for the Class III felony was 20 years, and the statutory minimum was 1 year. Neb. Rev.Stat. § 28–105(1) (Reissue 1985). The statutory maximum prison sentence for the Class IV felony was 5 years, and there was no statutory minimum. *Id.*

Rev.Stat. § 28–1205(1) (Reissue 1989).[6]

8. Given Nebraska's sentencing law as it existed at that time:

(a) If inclined to be harsh, the sentencing judge could have given Lyman the maximum sentence on all counts upon conviction (205 years to be served consecutively)[7] and required that he serve a minimum of one-third of the maximum total consecutive sentence, or about 68–⅓ years. Neb.Rev.Stat. § 83–1,105(1) (Reissue 1987).

(b) If inclined to be lenient, the sentencing judge could have given Lyman a straight sentence of no more than the minimum for each count upon conviction, and the lowest minimum sentence that could have been imposed was no less than 2 years (four 1–year concurrent sentences on each knife count, statutorily required to be consecutive, to three 1–year concurrent sentences on the remaining charges that had statutory minimum sentences).[8] Neb.Rev.Stat. § 83–1,105(2) (Reissue 1987).

(c) The sentencing judge could also have imposed sentences between these two extremes upon conviction.

(d) The earliest parole-eligibility date would be established by the minimum term of the sentences if the sentences were indeterminate, Neb.Rev.Stat. §§ 83–1,105(1) & 83–1,107(1)(a) (Reissue 1987), or by the minimum statutory term if the sentence was for a specific term without a stated minimum. *Id.*, §§ 83–1,105(2) & 83–107(1)(a). In effect, the sentencing judge could have set the parole-eligibility date anywhere between 2 years and 68–⅓ years.[9]

(e) The mandatory release date would be established by the maximum term of the sentences. *Id.*, § 83–1,107(1)(b).

## C. WHAT LYMAN FACED AS A RESULT OF THE PLEA

After pleading guilty to amended charges, Lyman faced the following:

1. Conviction by guilty plea on two counts of first-degree assault, (Filing 14, Am. Information, Counts I, III), regarding the children;[10]

2. Conviction by guilty plea on one count of commission of a felony with a knife, (Filing 14, Count II), the victim not being specified;[11]

---

6. These charges were Class III felonies. The statutory maximum prison sentence for a Class III felony was 20 years, and the statutory minimum was 1 year. Neb.Rev.Stat. § 28–105(1) (Reissue 1985). In addition, the sentences resulting from conviction on these counts were statutorily required to be served consecutively. Neb.Rev.Stat. § 28–1205(3) (Reissue 1989).

7. So long as each count requires proof of evidence that another count does not require, such as where there is more than one victim, Nebraska law permits a sentencing judge to impose consecutive sentences. *State v. Chapple*, 197 Neb. 4, 8, 246 N.W.2d 714, 716–17 (1976) (trial judge was authorized to impose consecutive sentences regarding deaths resulting from one motor vehicle accident resulting in two motor vehicle homicide charges). When there are two or more consecutive sentences, eligibility for parole does not occur until the offender has "served the total of the minimum terms," and the mandatory release date is calculated by "adding" the "maximum terms." Neb.Rev.Stat. § 83–1,110(2) (Reissue 1987).

8. During oral argument conducted by telephone concerning Respondent's objection to the report and recommendation, counsel for both sides agreed that the sentencing judge could have made each knife-count sentence run concurrent-

ly with every other knife-count sentence, despite the statutory direction regarding imposition of consecutive sentences, so long as the sentences on all the knife counts (as a group) ran consecutively to all the sentences on the predicate felonies. This is the most generous interpretation of the statute insofar as Lyman is concerned. For purposes of this case only, I assume that counsels' interpretation of the statute is correct.

9. Parole-eligibility and mandatory-release dates were also impacted by credit for time served in jail awaiting conviction, Neb.Rev.Stat. § 83–1,106 (Reissue 1987), and so-called "good time." Neb.Rev.Stat. § 83–1,107 (Reissue 1987). For purposes of the point made in the text, these factors are not material.

10. As noted earlier, these were Class III felonies. Each count of conviction carried a possible sentence of up to 20 years in prison, with a statutory minimum prison sentence of 1 year.

11. As noted earlier, this was a Class III felony. A conviction on this count carried a possible sentence of up to 20 years in prison, with a statutory minimum prison sentence of 1 year. There was a statutory requirement that this sentence be served consecutively.

3. Given Nebraska's sentencing law as it existed at that time:

(a) If inclined to be harsh, the sentencing judge could have given Lyman the maximum sentence on all counts upon conviction (60 years to be served consecutively) and required that he serve a minimum of one-third of the maximum total consecutive sentence, or 20 years. Neb.Rev.Stat. § 83–1,105(1) (Reissue 1987).

(b) If inclined to be lenient, the sentencing judge could have given Lyman a straight sentence of no more than the minimum for each count upon conviction, and the lowest minimum sentence that could have been imposed was 2 years (one 1–year sentence on the knife count, statutorily required to be served consecutively to the sentence on the predicate felony or felonies, and two 1–year concurrent sentences on the remaining charges that had statutory minimum sentences). Neb.Rev.Stat. § 83–1,105(2) (Reissue 1987).

(c) The sentencing judge could also have imposed sentences between these two extremes upon conviction.

(d) The earliest parole-eligibility date would be established by the minimum term of the sentences if the sentences were indeterminate, Neb.Rev.Stat. §§ 83–1,105(1) & 83–1,107(1)(a) (Reissue 1987), or by the minimum statutory term if the sentence was for a specific term without a stated minimum. Id., §§ 83–1,105(2) & 83–107(1)(a). In effect, the sentencing judge could have set the parole-eligibility date anywhere between 2 years and 20 years.

(e) The mandatory release date would be established by the maximum term of the sentences. Id., § 83–1,107(1)(b).

By pleading guilty, Lyman reduced his sentencing exposure as follows:

(1) The statutory maximum was reduced from 205 years to 60 years.

(2) For purposes of parole eligibility, the "maximum minimum" was reduced from 68–⅓ years to 20 years.

(3) The statutory "mandatory minimum" remained the same at 2 years.

## D. WHAT LYMAN RECEIVED AS A RESULT OF THE PLEA

The sentencing judge sentenced Lyman to 5 to 10 years on each count to which he pleaded guilty, with the sentences to run consecutively. (Filing 14, J. & Sentence of 12/31/87.) Lyman was also given credit for time served while in jail awaiting conviction. (Id.)

Since Lyman's sentence was indeterminate, his parole-eligibility date (not considering "good time" or pretrial jail credits) would have been 15 years from the date of imposition of sentence. Neb.Rev.Stat. §§ 83–1,107(1)(a) & 83–1,110(2) (Reissue 1987). Lyman's mandatory release date (not considering "good time" or pretrial jail credits) was 30 years from the date of sentence. Neb. Rev.Stat. §§ 83–1,107(1)(b) & 83–1,110(2) (Reissue 1987).

## E. EVIDENCE REGARDING LYMAN'S KNOWLEDGE OF PENALTY

There are two facets to the question of what Lyman knew about the penalty that could be imposed upon him at the time he pleaded guilty. The first facet relates to whether Lyman knew the penalty on the knife count was consecutive (claim 3(g)). The second facet relates to whether trial counsel advised (or misadvised) Lyman of the minimum time he would be imprisoned (claim 3(h)) before he was eligible for parole. I think it important to consider these questions separately.

### 1. Consecutive Nature of Sentence on Knife Count

Lyman's trial counsel testified in a deposition given in this case that he told Lyman the knife counts carried with them consecutive sentences. For example, trial counsel stated, "I'm positive I told him that the use [use of a knife in commission of a felony] had to be consecutive." (Ex. 1 Barrett Dep.Tr. 92:1–2.)

Lyman did not dispute this point at the evidentiary hearing. Rather, Lyman simply stated that he did not "recall" that his trial counsel told him of the consecutive nature of the knife-count sentence. (Filing 72, Tr. 91:7–9.) When asked whether the consecu-

tive nature of the knife-count sentence would "have been a factor in your decision making," Lyman responded, "Not to my knowledge, no." (*Id.* at 103:3–11.) As Lyman acknowledged (and as the Nebraska Supreme Court found in *Lyman I* and *Lyman II* ), the consecutive nature of the knife-count sentence did not matter to Lyman because he believed from what the sentencing judge (erroneously) told him that his minimum sentence was three years. (*Id.* at 113:7–18.) Thus, a consecutive sentence was of no importance to Lyman since his proper statutory minimum sentence was less than what Lyman believed his proper statutory minimum sentence to be.

## 2. Parole Eligibility

Lyman's trial counsel testified that he did not recall whether he talked with Lyman about parole-eligibility dates prior to acceptance of the pleas. Trial counsel testified that regarding "parole dates or eligibility dates, I don't recall anything along those lines." (Ex. 1 Barrett Dep.Tr. 83:10–11.) Counsel acknowledged that there could have been discussions along those lines, but he did not recall them. (*Id.* at 83:12–14.) [12]

Lyman, on the other hand, testified that before he agreed to plead guilty his trial counsel talked about parole-eligibility dates with him: "He assured me that three would be my bottom number, and a whole lot of it didn't make sense to me at the time. . . .

[H]e tried to explain indeterminate sentence to me, and the three in relation to it which I understood to be what I would receive as a bottom number." (Filing 72, Tr. 86:25–87:6.)

Lyman *understood* that "3" was "[m]y maximum minimum term." (*Id.* at 87:16–22.) But Lyman did not state that trial counsel told him that the "*maximum* minimum" term would be 3 years (as opposed to the statutory "*mandatory* minimum"). Rather, Lyman stated that such was the conclusion he drew from what his lawyer did tell him:

Q. And that's the three-year period you were talking about, then that was that three-year period that would be on the three to 60 that you could be sentenced as high as three to 60?

A. My maximum minimum term, right.

Q. That's what you understood the three to be?

A. Correct.[13]

(*Id.*)

Lyman also noted that the sentencing judge told him at the plea-taking session that he "could receive as high as three to 60 years," and this advice confirmed what Lyman thought his lawyer had told him about parole eligibility. (Filing 72, Tr. 88:11–22.) As a matter of fact, the sentencing judge informed Lyman that the sentences "could be made to run one after the other," so "you're talking about a possibility of up to as high as three to 60 years on the imprisonment."

---

**12.** It is clear that trial counsel discussed the final plea offer and the possible penalties under the new charges. It is also true, as Judge Piester noted, that trial counsel spoke with Lyman of "mandatory minimums." (Filing 67, slip. op. at 14 (citing Barrett Dep.Tr. 19:13–21:22).) However, a reading of the portion of the Barrett deposition cited by Judge Piester reveals that trial counsel was referring to statutory mandatory minimum 1–year sentences, not "maximum minimums," for parole-eligibility purposes. Trial counsel testified that "[o]n any case that I handled where there was a . . . mandatory minimum sentence . . . that was absolutely one of the things we had to talk about. In this case where the charges all were, except for the second degree assault they all required a *one year mandatory minimum* we definitely would have talked about [such statutory minimums]." (Ex. 1 Barrett Dep.Tr. 20:13–20.) (Emphasis added.)

**13.** To the extent that Judge Piester believed Lyman testified that his lawyer explicitly informed him that the "maximum minimum" sentence for

parole eligibility was 3 years, (Filing 67, slip. op. at 14), I conclude that Judge Piester was in error. The transcript of the evidentiary hearing was prepared at my request; thus, it is likely that Judge Piester did not have a written transcript of precisely what Lyman testified to at the evidentiary hearing when he prepared his report and recommendation. I cannot find any place in the transcript where Lyman specifically testified that his trial counsel explicitly told him his "maximum minimum" for parole eligibility was 3 years. It is clear that Lyman testified he and his lawyer discussed "three years" as the "bottom." It is also clear that Lyman *believed* the "three year bottom" was his parole-eligibility date. But Lyman's testimony leaves open the very real possibility that his understanding was predicated on a discussion of a 3–year *statutory* minimum as opposed to a representation by his counsel that 3 years was the "maximum minimum" for parole-eligibility purposes.

(Filing 35, Ex. A Bill of Exceptions (Plea–Taking Tr. of 11/16/87, at 7:13–19).)

Thus, the evidence clearly shows that Lyman believed his "maximum minimum" sentence for purposes of parole eligibility was 3 years, and this belief stemmed, at least in part, from a conversation Lyman had with his trial counsel. On the other hand, the evidence does not reflect that trial counsel told Lyman his "maximum minimum" sentence (as opposed to the statutory minimum sentence) would be 3 years for parole-eligibility purposes. Rather, the evidence reveals Lyman drew that conclusion from what he was told by his trial counsel.

### F. EVIDENCE REGARDING INVESTIGATION AND PURSUIT OF INSANITY DEFENSE

Magistrate Judge Piester also found that trial counsel was ineffective because counsel did not (i) investigate the insanity defense (claim 3(d)) and (ii) pursue the insanity defense (claim 3(f)). I think it appropriate to consider Judge Piester's findings separately from a factual point of view. I turn to that task now.

#### 1. Failure to Investigate

Trial counsel retained two psychiatrists to assist him in evaluating both whether Lyman was competent to stand trial and whether Lyman was insane when he committed the offenses.

As indicated earlier, both psychiatrists believed Lyman was competent to stand trial. Moreover, while both psychiatrists agreed that Lyman was quite mentally disturbed, both also stated in writing that Lyman "did know the nature and consequences of his acts. He also knew at the time of the crime that he deserved punishment for his crime," (Pet'r's Ex. 1, attached Ex. 209, at 8 (Dr. Kentsmith, 8/31/87)), and "[h]e planned it, concealed himself in the house with a weapon, and committed the assaults with full awareness that they were illegal acts." (*Id.*, attached Ex. 215, at 2 (Dr. Mead, 10/29/87).)

Trial counsel specifically testified that he was also orally advised by both psychiatrists that Lyman was *not legally insane:*

It seems to me in both of their reports it was the conclusion that he was not legally insane.

And I remember talking specifically to both doctors and asking them that point blank, if that's what their reports were saying, and they both said yes.

(Ex. 1 Barrett Dep.Tr. 97:8–14.)

Indeed, there is no evidence that either psychiatrist ever told trial counsel Lyman had a viable insanity defense.

Dr. Mead, one of the psychiatrists, was called to testify at the evidentiary hearing on Lyman's federal habeas petition. While Dr. Mead indicated to counsel appointed to represent Lyman in this habeas case (some six years after the fact) that he thought Lyman might have had a viable insanity defense, (Ex. 2, Letter of 7/13/93), he also testified that he did not recall telling trial counsel Lyman had a viable insanity defense:

Q. Okay. I'm talking about the attorney, Mr. Barrett, that originally represented Mr. Lyman in connection with the criminal proceedings. Did you have any discussions with him regarding your thoughts as to what a jury might or might not do?

A. I'm not sure that I had any conversation with him about that. This is seven years ago. I know now that the reports that we have been using did go to Mr. Barrett, but I, frankly, don't recall what the personal contacts with him entailed.

(Filing 72, Tr. 53:22–54:7.)

When Lyman pleaded guilty in November, 1987, Nebraska's law regarding the insanity defense placed the burden on the defendant to prove insanity by the preponderance of the evidence. Neb.Rev.Stat. § 29–2203 (Reissue 1985). In order to prove the defense of insanity, a defendant was required to establish the following:

(1) That the defendant had a mental disease or defect at the time of the acts charged; and

(2) That the mental disease or defect impaired the defendant to such an extent that either (a) the defendant did not understand the nature and consequences of what he was doing, or (b) the defendant did not know the difference between right and wrong with re-

spect to what he was doing. *Nebraska Jury Instructions 2d Criminal* § 7.0 NJI2d Crim. 7.0 (1992) (citing, among other cases, *State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984)).

In light of what both psychiatrists told defense counsel in their written reports, while Lyman obviously had a mental disease or defect, the psychiatrists could *not* have testified that he did not understand the nature and consequences of what he was doing or that he did not know the difference between right and wrong. Based upon what they told trial counsel, Lyman simply had no viable insanity defense because the defense psychiatrists could not testify truthfully that Lyman met the second prong of the two-part Nebraska insanity defense. In fact, if asked by the prosecution, the psychiatrists would have had to testify (if they testified in accordance with their reports) that Lyman was *not* legally insane.[14]

### 2. Failure to Pursue

Judge Piester also found that defense counsel failed to pursue the insanity defense because (1) although trial counsel filed a notice of insanity defense on November 12, 1987, counsel did not file the notice 60 days before trial, as required by law, and (2) when the trial judge gave defense counsel the opportunity to assert the insanity defense in exchange for a speedy-trial waiver, defense counsel insisted on a speedy trial, thereby failing to regain the opportunity to assert the insanity defense. (Filing 67, at 24.) Thus, there are two time frames that must be examined with regard to the failure-to-pursue claim.

### (a) The 60–Day Deadline

The first time frame that must be examined is the period 60 days before trial. Neb. Rev.Stat. § 29–2203 (Reissue 1985) provided in pertinent part that the defense was required to give notice of an insanity defense "not later than sixty days before trial." Judge Piester reasoned that since the charges against Lyman were filed on June 17, 1987, trial counsel should have been aware that under Nebraska's six-month

speedy-trial deadline, Lyman's trial date could not have been later than December 17, 1987. (Filing 67, at 22–23.) Accordingly, Judge Piester believed that notice of the insanity defense must have been filed by October 17, 1987. (*Id.*) *See* Neb.Rev.Stat. § 29–1207 (Reissue 1985) (Nebraska's speedy-trial law).

However, there is a factual difficulty with the finding that trial counsel was required to file notice of an insanity defense by October 17, 1987. No trial date had been set *by the judge* on October 17, 1987; therefore, trial counsel could not have known when the 60–day time limit would expire.

Indeed, trial counsel explicitly told the trial judge about this problem when the judge noted the filing date of the notice, but the judge simply ignored trial counsel. (Ex. 1 Barrett Dep. (attached Ex. 217, at 3:19).) As a matter of fact, it appears that trial counsel filed the notice on November 12, 1987, (*id.* at 2:10), five days *before* the trial judge even considered setting a trial date. As the trial judge noted at the status conference held on November 13, 1987, "[t]he trial date has to be set by November 17th ... and the trial date would now be set for November 30th...." (*Id.* at 3:20–21.)

In this connection, it is important to recognize that the notice of insanity defense very probably triggered a speedy-trial-computation exclusion under Nebraska law because the prosecution was then entitled to have Lyman examined. *Compare* Neb.Rev.Stat. § 29–1207(4)(a) (Reissue 1985) (speedy-trial exclusion resulting from other proceedings "including but not limited to an examination and hearing on competency ...") *with* Neb. Rev.Stat. § 29–2203 (Reissue 1985) (upon filing of the insanity-defense notice the court was authorized to order a psychiatric examination of the defendant and the results would be provided to the prosecution). Thus, there was no reason for Lyman's counsel to believe that he should file the notice of insanity defense 60 days before the speedy-trial clock

---

**14.** It is obvious that Lyman's counsel filed the notice of insanity defense to see if he could prompt plea negotiations. Indeed, as Judge Piester found, (Filing 67, slip. op at 22), two days

after trial counsel filed the notice, plea negotiations ensued that resulted in Lyman's pleas to substantially reduced charges.

would otherwise run if no trial date was set because any such notice, whenever filed, would likely have tolled the statute when the prosecution sought to have Lyman examined.

Even more significantly, the prosecution did not claim the notice of insanity defense was untimely; the trial date was not set until after the filing of the notice; and both the defense and the prosecution were prepared to try the case on the date the judge set for trial. Indeed, it appears that the only person troubled by the date of the notice was the trial judge, who made his views known without any claim or motion by the prosecution. In addition, the prosecutor explicitly told the trial judge that notwithstanding the date of the filing of the insanity notice, "the State at this time feels that they would be prepared to go to trial on November 30th in any event ..." and "if it is necessary for the State to have the defendant examined, that they can probably accomplish that by November 30th and would be willing to waive any 60 day notice and proceed to trial on November 30." (Ex. 1 Barrett Dep. (attached Ex. 217, at 2:25–3:4.) Lyman's counsel responded, "I agree that the case could be tried on the 30th, well within the six month period." (*Id.* at 3:14–15.)

Finally, at the time this issue arose in 1987, there were no cases which interpreted the 60–day notice in the way the trial judge interpreted the statute. A plain reading of the "60–day" language in the statute also does not suggest that trial counsel's interpretation of the statute was unreasonable.

It is difficult to understand factually how trial counsel was supposed to give a notice of insanity defense "not later than sixty days before trial" when (1) trial counsel did not know what the trial date was when he filed the insanity-defense notice; (2) the trial date was not set *until after* trial counsel gave notice of the insanity defense; (3) if the prosecution wanted a speedy-trial-computation exclusion, Nebraska's speedy-trial law apparently provided for such an exclusion and, thus, there was no reason for defense counsel to assume he was required to file the notice 60 days before the speedy-trial clock would otherwise run out; (4) the prosecution did not contend that the notice of insanity

defense was untimely or that the prosecution was otherwise prejudiced by the timing of the notice; (5) there was no case law that parsed the meaning of the deadline found in Neb.Rev.Stat. § 29–2203 (Reissue 1985); and (6) a plain reading of the statute does not indicate that trial counsel's interpretation of it was unreasonable.

#### (b) Abandonment of the Defense

Judge Piester was also concerned because he believed that trial counsel abandoned the insanity defense without consulting Lyman when counsel failed to agree during the status conference on November 13, 1987, to waive Nebraska's speedy-trial provisions in exchange for being allowed to pursue the insanity defense which the trial judge had ruled was out of time.

It is true that the trial judge ruled on November 13, 1987, that the notice filed on November 12, 1987, was filed out of time. It is also true that trial counsel refused to waive the speedy-trial provisions in exchange for an opportunity to pursue the allegedly untimely notice. However, two additional factors must be considered in order to paint an accurate factual history.

First, the trial judge believed the notice of insanity defense was out of time; therefore, he demanded a waiver of the speedy-trial clock as a result of the supposedly untimely filing of the notice. As noted above, however, trial counsel had very good reasons for disagreeing with the trial judge.

Second, a speedy-trial waiver was manifestly unnecessary even if the notice of insanity defense was out of time. *Both* the defense and the prosecution were ready to go to trial on the date the *judge* set for trial (November 30, 1987), which date was well within the 6–month speedy-trial time. Trial counsel repeatedly made this clear to the trial judge. (Ex. 1 Barrett Dep. (attached Ex. 217, at 2:25–3:4; 3:14–15; 4:6–22.) If anything, the trial judge's conduct bordered on the abusive when the judge insisted on a waiver of the speedy-trial law even though such a waiver was unnecessary in order to try the case *on the date the judge, the prosecution and the defense agreed was a proper date for trial.*

## II. THE MERITS

I shall first examine the applicable law as it pertains to Lyman's ineffective-assistance-of-counsel claim. I shall then apply that law to the facts found by Judge Piester, as supplemented and modified by the facts I found earlier.

### A. INEFFECTIVE ASSISTANCE OF COUNSEL GENERALLY

■ In order to prevail, Lyman must establish two things: (1) that his trial counsel's performance fell below professional norms; and (2) that as a result of his trial counsel's deficient performance, there is a reasonable probability that Lyman would not have pleaded guilty, but instead insisted on a trial. *Hill v. Lockhart,* 474 U.S. 52, 56–60, 106 S.Ct. 366, 369–71, 88 L.Ed.2d 203 (1985) (applying the two-part test in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to a case where the petitioner claimed he had been misadvised as to parole eligibility, and finding that the petitioner had failed to sufficiently allege prejudice).

■ With regard to the first part of the test concerning whether trial counsel's performance fell below professional norms, it is improper to "second-guess" counsel or to judge counsel's performance skeptically. Rather, I must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

■ With regard to the second part of the test concerning "prejudice," this prong is not based solely or even primarily upon the subjective views of the defendant about whether he would have gone to trial. Rather, in analyzing the situation objectively, a court must ask: (1) would a reasonable person have gone to trial knowing the true state of affairs; (2) is it conceivable that the defendant would have been acquitted had a trial been sought; and (3) even if not acquitted, is it conceivable that the defendant would have been given a shorter sentence than he actually received. *Hill,* 474 U.S. at 59, 106 S.Ct. at 370–71 (quoting *Evans v. Meyer,* 742 F.2d 371, 375 (7th Cir.1984): " 'It is inconceivable to us ... that [the defendant] would have gone to trial on a defense of intoxication, or that if he had done so he either would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence.' "). Indeed, this inquiry "depend[s] largely" on whether the "defense likely would have succeeded at trial." *Id.*

### B. INEFFECTIVE ASSISTANCE OF COUNSEL AS APPLIED

Judge Piester believed that:

(1) Trial counsel was ineffective because (a) counsel did not (i) advise Lyman of the mandatory consecutive nature of the possible sentences (claim 3(g)) nor (ii) advise Lyman of the minimum time he would be imprisoned (claim 3(h)); and (b) but for these errors, there was a reasonable probability that Lyman would not have pleaded guilty and instead insisted on a trial. (Filing 67, slip. op. at 12–16.)

(2) Trial counsel was ineffective because (a) counsel did not (i) investigate (claim 3(d)) and (ii) pursue (claim 3(f)) the insanity defense; and (b) but for these errors, there was a reasonable probability that Lyman would not have pleaded guilty and instead insisted on a trial. (*Id.* at 18–25.)

I shall separately examine each of Judge Piester's findings in relation to each specific claim. For each claim I shall determine the following: (1) whether trial counsel's performance fell below professional norms; and (2) if appropriate, whether as a result of trial counsel's allegedly deficient performance there is a reasonable probability that Lyman would not have pleaded guilty, but instead insisted upon a trial.

#### 1. Claim 3(g)

■ Judge Piester found that trial counsel failed to advise Lyman of the mandatory consecutive nature of the possible sentences (claim 3(g)). I disagree.

First, it is factually undisputed that trial counsel *did* advise Lyman of the mandatory consecutive nature of the possible sentences. (*See* Pt. IE.1 above.) Second, primarily for the reasons expressed by the Nebraska Su-

preme Court in *Lyman I* and *Lyman II,* even if trial counsel failed to inform Lyman of the consecutive nature of the sentences, Lyman was not prejudiced. If Lyman was willing to plead guilty when he thought the minimum sentence was 3 years, then logically it would make no difference to Lyman that the sentences were consecutive since the true statutory minimum (including the consecutive sentence) was less than what Lyman believed the statutory minimum to be.

## 2. Claim 3(h)

Judge Piester found that trial counsel failed to advise Lyman of the minimum time he would be imprisoned (claim 3(h)). I disagree.

■ First, it is clear that trial counsel and the sentencing judge both informed Lyman of the statutory minimum, although that advice was in error by 1 year. However, since the true statutory minimum was 2 years, and Lyman pleaded guilty believing it was 3 years, Lyman can show no prejudice.

■ Second, while it is clear that Lyman thought "3" was the "bottom" for parole-eligibility purposes, the evidence does not support a conclusion that trial counsel told Lyman "3" was the "bottom" for parole-eligibility purposes. (*See* Pt. IE.2 above.) Rather, it is much more plausible that trial counsel told Lyman about the *"mandatory* minimum" sentences, and Lyman wrongly believed counsel was speaking of the *"maximum* minimum" for parole-eligibility purposes. Indeed, Lyman admitted that "a whole lot of it didn't make sense to me at the time.... [H]e tried to explain indeterminate sentence to me, and the three in relation to it which I understood to be what I would receive as a bottom number." (Filing 72, Tr. 86:25–87:6.)

■ Third, I do not believe Lyman's confusion regarding *"mandatory* minimum" and *"maximum* minimum" can fairly be characterized as trial counsel's fault. If "a whole lot of it didn't make sense to [him] at the time," Lyman had some responsibility to tell his lawyer he was confused or uncertain. There is no credible evidence that he did so.

Accordingly, since advisement about *"mandatory* minimums" was obviously necessary in order for trial counsel to inform Lyman of the statutory penalty extremes he faced if he pleaded guilty, since parole-eligibility dates are by their very nature fluid and incapable of precise calculation, and since there is no credible evidence that Lyman brought his admitted confusion or uncertainty to the attention of his counsel, I do not believe trial counsel's performance was deficient when objectively measured against professional norms.

After all, I must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. I cannot assume that trial counsel is responsible for Lyman's confusion because although Lyman admitted to being confused and uncertain at the time, there is no credible evidence that Lyman told his trial counsel (or the sentencing judge) that he was confused and uncertain.

■ Fourth, even if Lyman's confusion was trial counsel's fault, and trial counsel's performance fell below professional norms as a result, Lyman can show no prejudice. While I am willing to believe Lyman's testimony, nearly seven years after the fact, that he now sincerely believes (and wishes) he would have gone to trial, I am unwilling to find that but for the alleged error there is a reasonable probability that Lyman would have gone to trial in 1987. I reached this conclusion for following reasons.

Initially, the evidence against Lyman was overwhelming on the merits. (*See* Pt. IB above.) Moreover, Lyman's insanity defense was nonexistent. (*See* Pt. IF.1 above.) While he was undoubtedly mentally ill, Lyman could not prove the second prong of the insanity defense (and he had the burden of proof). (*Id.*) Finally, given the possible penalties he faced if convicted on the original eight counts and the virtual certainty that he would have been convicted on all eight counts if he insisted on a trial, it is inconceivable that Lyman's sentence would have been better had he gone to trial. (*Compare* Pt. IB above *with* Pts. IC & ID above.) After all, if Lyman was truly concerned that the *"maxi-*

*mum* minimum" for parole purposes was 20 years on the counts to which he pleaded guilty, he would have been even more concerned that the *"maximum* minimum" for parole purposes was over 68 years on the original counts, especially given the strength of the prosecutor's case and the nonexistence of any defense. As a result, there is little or no probability that Lyman would have gone to trial in 1987 but for the alleged error.

### 3. Claim 3(d)

■ Judge Piester believed that trial counsel failed to investigate the insanity defense. I disagree.

The evidence overwhelmingly indicates that trial counsel made a full and complete investigation of the insanity defense. (*See* Pt. IF.1 above.) In this connection, Dr. Mead's testimony during the evidentiary hearing in this habeas corpus case has little or no significance. While Dr. Mead expressed the opinion long after Lyman's guilty plea in 1987 that Lyman might have had a viable defense, that certainly is not what Dr. Mead told Lyman's trial counsel in writing in 1987. Moreover, trial counsel swore under oath in his deposition, and Dr. Mead's testimony did not contradict him, that counsel orally confirmed with Dr. Mead (and with Dr. Kentsmith) that Lyman had no insanity defense.

In sum, trial counsel's performance in this regard was not only not deficient, it was exemplary. It is unnecessary (and probably impossible) under these circumstances to examine whether Lyman was "prejudiced" by assuming that his counsel's performance was in some unknown way deficient regarding claim 3(d).

### 4. Claim 3(f)

■ Judge Piester concluded that trial counsel failed to pursue the insanity defense. I disagree.

First, Judge Piester believed that trial counsel erred when he failed to file a timely notice of insanity defense pursuant to Neb. Rev.Stat. § 29–2203 (Reissue 1985) within 60 days of trial. However, I do not believe trial counsel's performance was deficient in this regard. (*See* Pt. IF.2(a) above.) Specifical-ly, I do not believe trial counsel's performance was deficient in this regard because:

(1) Trial counsel did not know what the trial date was when he filed the notice of insanity defense; thus, he could not have known when the 60–day limitation for filing the insanity-defense notice expired.

(2) The trial date was not set *until after* trial counsel gave notice of the insanity defense.

(3) If the prosecution wanted a speedy-trial-computation exclusion, Nebraska's speedy-trial law apparently provided for such an exclusion; thus, in the absence of a trial setting, there was no reason for defense counsel to assume he was required to file the notice 60 days before the speedy-trial clock would otherwise run out.

(4) The prosecution did not contend that the notice was untimely or that the prosecution was otherwise prejudiced by the timing of the notice.

(5) There was no case law that parsed the meaning of the deadline found in Neb.Rev. Stat. § 29–2203 (Reissue 1985).

(6) A plain reading of the statute does not indicate that trial counsel's interpretation of it was unreasonable.

■ Second, Judge Piester believed that trial counsel's performance was deficient because when the trial judge gave counsel the opportunity to assert the insanity defense in exchange for a speedy-trial waiver, counsel would not waive the speedy trial limitation. I do not believe trial counsel's performance was deficient in this regard. (*See* Pt. IF.2(b) above.) I reached this conclusion because:

(1) Trial counsel had many good reasons for his belief that his notice of insanity defense was not untimely.

(2) Even if the notice of insanity defense was untimely, a speedy-trial waiver was unnecessary (and perhaps improper) because the trial judge, the prosecution and defense counsel all agreed that the trial could have taken place within the speedy-trial period without such a waiver.

■ Third, I do not believe Lyman was prejudiced by trial counsel's alleged failure to

pursue the insanity defense, even if it amounted to deficient performance under *Strickland.* I reached this conclusion for the following reasons.

To begin with, the "insanity defense" was not "abandoned" as a practical matter. The filing of the insanity-defense notice (no matter the judge's ruling) clearly prompted successful plea negotiations. Indeed, the plea negotiations that led to the substantially reduced charges began *after* the judge's ruling and took place *notwithstanding* that ruling. Thus, Lyman received a very substantial benefit, (*compare* Pt. IB above *with* Pt. IC above), from the "insanity defense" even though the trial judge had decided to exclude the defense if a speedy-trial waiver was not submitted.

More importantly, there is no reasonable probability that Lyman would have insisted on a trial in 1987 but for the alleged errors of trial counsel. As noted above, (1) the evidence against Lyman was overwhelming; (2) Lyman had no viable insanity defense and he had the burden of proof on such a defense [15]; and (3) Lyman's sentencing exposure, including the "*maximum* minimum" for parole-eligibility purposes, was much greater on the eight original charges than on the three reduced charges, and given the fact that the evidence against Lyman was overwhelming and that he had no viable defense, it is inconceivable that he would have taken the risk of a trial.

## III. SUMMARY

To the extent that he found that trial counsel's performance was ineffective and that such conduct prejudiced Lyman, I respectfully disagree with Magistrate Judge Piester's report and recommendation for the reasons articulated above. Otherwise, after de novo review, I adopt Judge Piester's well-reasoned report and recommendation. Accordingly, Lyman's petition will be denied.

IT IS ORDERED that:

(1) Respondent's objections (Filing 69) to Judge Piester's report and recommendation are sustained on the merits;

(2) Judge Piester's report and recommendation (Filing 67) is adopted in part and rejected in part, as stated above;

(3) Judgment shall be entered by separate document, providing that:

JUDGMENT is hereby entered:

a. For Respondent and against Petitioner, providing that the amended petition is dismissed and Petitioner shall take nothing;

b. The following claims are denied on the merits: 2(b), 3(a), 3(d), 3(f), 3(g), 3(h), 3(j), and 3(k); and

c. All other claims are denied on procedural grounds.

---

15. Lyman observes that as to the second prong of the insanity defense he could prevail if he proved *either* that he did not understand the nature and consequences of what he was doing *or* that he did not know the difference between right and wrong. Lyman is correct in this regard. *Nebraska Jury Instructions 2d Criminal* § 7.0 NJI2d Crim. 7.0. But this hardly helps Lyman since he could have proved neither element. He clearly knew the nature and consequences of what he was doing. For example, Dr. Kentsmith informed defense counsel in writing that Lyman "did know the nature and consequences of his acts." (Pet'r's Ex. 1, attached Ex. 209, at 8.) Dr. Mead agreed, informing defense counsel in writing that "[h]e planned it, concealed himself in the house with a weapon...." (*Id.*, attached Ex. 215, at 2.) Moreover, Lyman obviously knew that the difference between right and wrong. For example, Dr. Kentsmith informed defense counsel in writing that "He also knew at the time of the crime that he deserved punishment for his crime." (*Id.*, attached Ex. 209, at 8.) Dr. Mead likewise informed defense counsel in writing that Lyman "committed the assaults with full awareness that they were illegal acts." (*Id.*, attached Ex. 215, at 2.) The fact that Lyman may have believed he was justified in what he was doing because of his religious beliefs does not obviate the pertinent legal conclusion that he knew his crime was unlawful, he understood practically what he was doing, and he knew the probable consequences of the crime both to the victims and to himself.